Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

COPY

---

LISA CHARETTE,            )
            Plaintiff,    )
                          )
        vs                )
                          )
RUDOLPH JONES, (in his individual and )
official capacities);     )
RONALD GORGETTI (in his individual and )
official capacities);     )
JOHN GALLIETTE (in his individual and )
official capacities);     )
JOHN HALLIDAY (in his individual and )
official capacities);     )
BRIAN MERBAUM (in his individual and ) CIVIL ACTION #
official capacities),     ) 3:01cv1927(WWE)
            Defendants.   )

---

VOLUME I

---
Deposition of: LISA CHARETTE
---

Taken before Tina M. Davis, Stenographer and
Notary Public in and for the State of Connecticut,
pursuant to notice, at the offices of
PATH OUTPATIENT SERVICES, 675 Tower Avenue,
Suite 301, Hartford, Connecticut, on Thursday,
August 3, 2006 scheduled to commence at
approximately 3:30 p.m.

Tina M. Davis, LSR
License No. 00221
Brandon Smith Reporting Service
44 Capitol Avenue
Hartford, CT  06106
(860) 549-1850

Exhibit A

Brandon Smith Reporting

Charette v. Jones

8/3/2006                                              Lisa Charette

Page 6

1           (Defendants' Exhibit No. 1, Second Amended

2      Complaint, marked for identification.)

3

4           (The deposition commenced

5      at approximately 3:39 p.m.)

6

7   LISA CHARETTE, deponent, having been duly sworn

8   by the Court Reporter, deposes and states as

9   follows:

10

11                    DIRECT EXAMINATION

12

13 BY MR. JORDANO:

14    Q.  Will you please state your full name and spell

15 your last name so the Court Reporter can take it down?

16    A.  Lisa A. Charette, C-h-a-r-e-t-t-e.

17    Q.  Ms. Charette, are you a resident of the

18 State of Connecticut?

19    A.  Yes, I am.

20    Q.  All right.  Have you ever been deposed before?

21    A.  Yes.

22    Q.  All right.  So you probably know this process,

23 but I'll go over it again just so you know.

24        I'm going to ask you some questions today.  The

25 Court Reporter here to my right is going to take down

Charette v. Jones

8/3/2006                                                    Lisa Charette

Page 33

1  services. I was basically told not to do that.
2     Q. Let me back up. When a decision was made on the
3  initial application for Social Security Disability
4  benefits, would the letter be generated by your office
5  or someplace else?
6     A. It was generated within the office with the Wang
7  system I worked on.
8     Q. All right. Was it actually a letter that came
9  out on Social Security Administration letterhead?
10    A. I don't recall at this time.
11    Q. All right. Do you know if your file -- any files
12 that you did as an Intern I, the initial Social Security
13 application from an applicant, were any of those
14 reviewed by anyone from the Social Security
15 Administration --
16    A. We had --
17    Q. -- as part of the process?
18    A. We had a quality assurance process, if that's
19 what you're asking. The files were randomly chosen and
20 brought to a different area for an independent review as
21 a quality assurance branch.
22    Q. All right. So you had a separate quality control
23 area that would randomly select files?
24    A. There was an area within DDS, and there was an
25 area outside of DDS.

Brandon Smith Reporting

Charette v. Jones

8/3/2006                                                                    Lisa Charette

Page 34

1          And the discovery, like I've requested, of the
2    records that I -- to let you know -- still have not
3    received to date, even though some of your responses
4    said that I have, show that my quality returns that I
5    got through internally and externally were, I think,
6    seven and six-and-a-half-years of employment.
7       Q.  Well, Ms. Charette, I didn't ask you what your
8    quality returns were, and I didn't ask you whether or
9    not you got discovery documents.
10          I'd like you to confine your answer to the
11   questions that I asked you.  If you have some issues
12   about discovery, you can give those to your counsel.
13   That's not the question I asked you.
14          I asked you whether or not when files that you
15   worked on as an Intern I, if they were reviewed by
16   anyone from Social Security.  I think you told me that
17   there was a quality assurance either unit or people
18   within DSS; is that correct?
19      A.  No.  DDS.
20      Q.  DDS.
21          All right.  So someone with DDS, some area, would
22   randomly review files that were reviewed that were
23   handled by you as an Intern I; is that a fair statement?
24      A.  At DDS, yes.
25      Q.  All right.

0ddb9321-b4c2-472e-8086-6168d0a516d5

Page 20

1  information --

2  A.  Yes.

3  Q.  -- relating to Social Security Disability claims
4  when you worked for DSS; is that correct?

5  A.  And psychological, yes.

6  Q.  All right.  So would it be a fair statement that
7  -- my previous question -- DSS has involvement in
8  handling Social Security Disability claims, and your job
9  was an example of their involvement; is that a fair
10 statement?

11 A.  I can only say what my job was, and I believe my
12 job was 100 percent federally funded.  So I do not know
13 how to answer your question.  I'm sorry.

14 Q.  Well, let me rephrase it.  I'm not asking you who
15 funded your job.  I'm asking you as part of your job,
16 your daily job, did you evaluate Social Security
17 Disability claims?

18 A.  Yes.

19 Q.  All right.  And you did that as an employee of
20 DSS; is that correct?

21 A.  That's where my paycheck came from, yes.

22 Q.  All right.

23 A.  But my instructions came from the Government.

24 Q.  All right.  Now, did you only involve -- now, you
25 would look at, in your job, the initial Social Security

Charette v. Jones

8/3/2006                                                                 Lisa Charette

Page 21

1 application; is that correct?

2  A. Yes. It would be in the file. I wasn't involved
3 in the application process. That was at a different
4 avenue.

5  Q. All right. Did your job involve obtaining
6 medical records that the applicant put on the form,
7 listed on the form, and signed waivers for?

8  A. Yes.

9  Q. All right. So did your job include accumulating
10 whatever medical evidence the applicant may have
11 identified so you could evaluate their claim?

12  A. Yes. We would try to get in if we could. If
13 not, then we'd have to take appropriate action.

14  Q. All right. I understand.

15     Okay. After you assembled whatever information,
16 are you the one who actually made a recommendation
17 regarding whether or not someone should be approved or
18 disapproved for --

19  A. We would do evaluations and write up -- and be
20 trained at certain levels to do things.

21     Unfortunately, that was part of the problem,
22 because I was trying to do things to help expedite the
23 claim of cases and was not permitted to do that. My
24 cases were being removed, they were being hidden, being
25 stashed, things were being pulled out. Basically my job

Page 22

1 was obstructed.

2    Q.  All right.  I'm going to ask you simply to answer
3 the question that I asked.  So I'll rephrase it again.
4        After doing your job at DSS, after you
5 accumulated the medical evidence or medical information
6 in order to evaluate a claimant's Social Security
7 disability application, did your job involve making a
8 recommendation as to whether or not a particular
9 application should be approved at the level that you
10 looked at it?

11   A.  I think I answered that.  Yes, I was part of the
12 process.

13   Q.  All right.

14   A.  If you consider that the recommendation, it was a
15 team effort between the evaluator or the adjudicator,
16 who was myself, and the doctor involved.  It was a
17 two-people [sic] decision making process.  And we
18 sometimes didn't agree.

19   Q.  All right.

20   A.  So I was involved.

21   Q.  All right.  So each claim -- would your
22 involvement traditionally be the first level of a
23 Social Security application, the first evaluative level?

24   A.  There was many different levels.  As I was
25 promoted and competently did my job, different levels of